**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| John Doe, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. |
| v. | : | |
| | : | Judge |
| The Ohio State University, | : | |
| | : | **JURY TRIAL** |
| Defendant. | : | **ENDORSED HEREON** |

## <u>COMPLAINT</u>

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

    a)   JD's Interactions with Dr. Strauss ............................................................................ 3

    b)   "Appropriate Persons" at OSU Knew of Dr. Strauss's Predation and Did Nothing ......... 6

JURISDICTION AND VENUE ............................................................................................ 9

PARTIES ............................................................................................................................. 9

SPECIFIC FACTUAL ALLEGATIONS ........................................................................... 10

I.   JD and Dr. Strauss .................................................................................................... 10

    a)   Background ............................................................................................................ 10

    b)   JD's Sexual Abuse by Dr. Strauss ....................................................................... 11

    c)   The Gradual and Devastating Impact of Dr. Strauss's Abuse of JD ..................... 13

    d)   JD Learns That Others at OSU Were Sexually Abused ........................................ 14

II.   OSU Knowingly Employed a Serial Sexual Predator ................................................ 14

II.   OSU Knowingly Employed a Serial Sexual Predator ................................................ 16

III.   Dr. Strauss is Finally Investigated, But OSU Continues to Cover His Tracks and Enable Dr. Strauss's Sexual Abuse of OSU Students ....................................................... 27

IV.   JD Did Not Know and Could Not Have Reasonably Discovered That Both Dr. Strauss's Sexual Abuse Was Widespread and that OSU Knew About It and Did Nothing ........................................................................................................................ 29

CLAIMS FOR RELIEF ..................................................................................................... 31

COUNT II ......................................................................................................................... 34

PRAYER FOR RELIEF .................................................................................................... 35

CERTIFICATE OF SERVICE .......................................................................................... 74

## **INTRODUCTION**

1.      This action is yet another example in a growing number of cases where institutions of higher learning retain physicians that turn out to be sexual predators.  And, instead of protecting its students, the school—in this case The Ohio State University ("OSU")—ignores the sexual misconduct of its employee, fails to inform its students that a sexual predator (cloaked by the school as a health care professional) is in their midst, and ultimately covers up evidence of the sexual predation of which it was well-aware.

2.      In this specific action the sexual predator was Dr. Richard Strauss ("Dr. Strauss"), and the victim was John Doe ("JD").

3.      Dr. Strauss was hired by OSU in or about 1978 and worked as a physician and professor at OSU until in or about March of 1998.

4.      As early as 1978, OSU supervisors and administrators had knowledge of Dr. Strauss's sexual predation of OSU students, yet made absolutely no effort whatsoever to inform its students about, or protect its students from, Dr. Strauss until nearly twenty (20) years later.

5.      Indeed, as concluded in the *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss Report* (August 30, 2019) ("Governor's Medical Board Report"): "Despite multiple supervising and colleague physicians who were aware of complaints/rumors against [Dr.] Strauss as far back as 1979, no [OSU] physician reported any wrongdoing by [Dr.] Strauss to the State Medical Board of Ohio.  More troubling, it appears the abuse was never reported to law enforcement by anyone at [OSU] or the Medical Board."[1]  The Governor's Medical Board Report, a report of the Ohio Department of Public Safety investigating the administrators within its largest State educational institution (*i.e.*,

---

[1] *Id.*, at pg. 2.

OSU), found this to be an "astounding failure of anyone in a position of authority to come forward to initiate a Medical Board or criminal investigation into [Dr.] Strauss's conduct."[2]

6.    In OSU's most recent annual crime report to date (issued in December 2020), OSU disclosed that Dr. Strauss committed at least 127 rapes, and at least 2,201 other sexual assaults on OSU students and student-athletes during his employment at OSU.[3]  At these numbers, even calling it an "astounding failure" does not truly capture the horrors OSU beset upon its students through OSU's (i) hiring of Dr. Strauss without a meaningful background check, (ii) allowing Dr. Strauss to remain as a treating OSU physician after reports of his sexual assaults on students began to pour in during Dr. Strauss's very first year at OSU, (iii) enabling Dr. Strauss's sexual assaults to continue by taking no action against him even after at least scores of reports of Dr. Strauss's sexual abuse were received by OSU administrators, and (iv) covering up, making excuses for, and failing to report Dr. Strauss to law enforcement even after an OSU investigation itself concluded that Dr. Strauss was a sexual predator.

7.    Plaintiff herein, JD, attended OSU from 1986, at least seven (7) years after OSU already knew of Dr. Strauss's sexual predation of students and student-athletes, until 1990.

8.    During his entire time at OSU, JD was a member of OSU's NCAA Division I Football Team.  Although Dr. Strauss gave required yearly physicals for the OSU Football Team, it does not appear that Dr. Strauss was specifically assigned to the Football Team.  On the occasions where Dr. Strauss sexually abused and assaulted JD, however, it was indeed in the context of OSU Football Team physicals, which JD was directed to take from Dr. Strauss by OSU Football Team staff and other OSU personnel.

---

[2] *Id.*

[3] https://news.osu.edu/university-issues-annual-crime-report-reminds-community-of-safety-resources/ (last visited on Sept. 15, 2021).

9.     Until no earlier than 2018, JD had no idea that OSU was aware Dr. Strauss was a sexual predator—preying on OSU students and student-athletes—as early as 1978.  Until no earlier than 2018, JD was entirely unaware of the massive scope of Dr. Strauss's sexual predation before, during, and after JD attended OSU.  Until no earlier than 2018, did JD become aware that any other OSU students and student-athletes had been sexually abused and assaulted by Dr. Strauss.

a)     **JD's Interactions with Dr. Strauss**

i.     **July 1986**

10.     In or about July 1986, as part of JD's incoming (Freshman) Football orientation, JD was directed by OSU Football Team staff to visit Dr. Strauss for an OSU-required physical. JD had never visited Dr. Strauss for medical treatment and had never met him prior, in any context. The "physical" took place in the Ernie Biggs Athletic Training Facility on OSU's Columbus, Ohio campus.

11.     When JD entered the exam room for his Freshman physical, Dr. Strauss immediately instructed JD to drop his shorts and underwear all the way to the floor.  JD thought this was somewhat odd but complied with Dr. Strauss's instruction.  Upon JD dropping his shorts and underwear, Dr. Strauss—sitting upon a rolling stool—rolled over to JD so that Dr. Strauss's face was mere inches from JD's genitals.

12.     Immediately after rolling "uncomfortably close" to JD (now naked from the waist down), Dr. Strauss began manipulating, massaging, and fondling JD's penis and testicles.  Dr. Strauss's manipulation, massaging, and fondling of JD's penis and testicles went on for at least "a couple of minutes."

13. Once Dr. Strauss was done with JD's genital region, other than taking *pro forma* vital signs, Dr. Strauss did little else during what was supposed to be a comprehensive Freshman Football physical.

14. JD, having had numerous prior sports physicals, recognized that Dr. Strauss's extended focus on JD's genitals was highly unusual. JD suspected that the exam may have been improper, but JD was a Freshman, in the midst of trying to earn a roster spot on the Football Team, and did not want to hinder his chances by complaining about Dr. Strauss's exam.

ii. **January 1987**

15. In or about January 1987, after JD's Freshman year on the Football Team had concluded, JD was instructed by OSU Football Team Staff to report for a body fat assessment test. The test was administered in Larkins Hall on OSU's Columbus, Ohio, campus. These types of tests generally involve analyzing a person's body weight both in and out of water.

16. When JD reported to Larkins Hall for his testing, as instructed by OSU Football Team Staff, Dr. Strauss was the physician administering the body fat index tests on that particular day.

17. JD had experienced similar tests in the past, and despite his being uncomfortable with seeing Dr. Strauss again, he figured he was just going to be weighed both inside and outside of the pool, so it was not a big deal.

18. JD proceeded to remove his shirt, shoes, and socks (leaving on only his outer shorts and compression underwear) and moved towards the pool-deck scale to be weighed. As JD was about to step on the scale, Dr. Strauss ordered JD to remove his outer shorts, which would leave him wearing only his skin-tight, and highly-revealing, compression shorts. JD's outer shorts

weighed only a few ounces, so JD found this very strange as he had never had to dress down to his athletic underwear at any time where he was previously weighed.

19.     Reluctantly, JD complied, once again not wanting to question an OSU Athletics doctor in fear of retribution.  Dr. Strauss then ordered JD onto the pool-deck scale and instructed him not to leave the scale until Dr. Strauss asked him to step down.  Once again, JD complied and stepped on the scale.

20.     Despite JD's weight being accurately accounted within a few seconds, Dr. Strauss had JD remain on the scale for an extended period of time while Dr. Strauss looked JD up and down, focusing primarily on JD's genital region.  Dr. Strauss made JD feel very uncomfortable during this process, but once again JD said nothing, in fear of any potential negative impact on his OSU Football career.

21.     JD then entered the pool for his submerged weight analysis, and then quickly left the pool-deck after his testing was completed.

### iii.     **August 1987**

22.     In or about August 1987, JD appeared at the Ernie Biggs Athletic Complex for his OSU-mandated yearly Football physical.  Upon arriving for this physical, JD was instructed by OSU Football Staff to be examined—once again—by Dr. Strauss.

23.     JD was reluctant to enter the exam room with Dr. Strauss but feeling like he had no choice—and not wanting to risk adverse consequences with respect to his OSU Football career— JD acquiesced and proceeded to be examined by Dr. Strauss.

24.     Similar to JD's prior experience with Dr. Strauss during his Freshman exam, Dr. Strauss had JD immediately drop his shorts and underwear to the floor.  Dr. Strauss then once

again rolled his stool up against JD, with Dr. Strauss then proceeding to manipulate, caress, and fondle JD's penis and testicles.

25. Like the last time, the overwhelming majority of the *exam* focused on JD's genitals and little else. At this point, JD was still reluctant to say anything, but with the prospect of additional physicals and other medical treatment from Dr. Strauss on the horizon—as JD was only then an entering Sophomore—JD decided to approach Billy Hill, OSU's Head Athletic Trainer at the time—and disclose his discomfort with Dr. Strauss's exams.

26. Upon describing to Billy Hill Dr. Strauss's highly unusual exams and JD's discomfort therewith, Billy Hill was dismissive of JD's concerns and simply stated that Dr. Strauss has his own way of doing things and that JD would simply have to deal with it.

### iv.    Junior and Senior Exams by Dr. Strauss

27. In or about both August 1988 and 1989, JD was instructed to see Dr. Strauss for JD's OSU-required yearly Football Team physicals. In each instance, the exams proceeded in the same manner as JD's Freshman and Sophomore exams.

28. Moreover, Dr. Strauss performed sham physicals on JD in each instance, manipulating, fondling, and caressing JD's genitals for Dr. Strauss's own sexual gratification, with little or no evaluative or therapeutic value to JD.

### b)    "Appropriate Persons" at OSU Knew of Dr. Strauss's Predation and Did Nothing

29. In or about April 2018, the law firm of Perkins Coie began an "independent investigation" into the alleged sexual misconduct of Dr. Strauss during his employment at OSU. In or about May 2019, Perkins Coie publicly released its report.[4] The Perkins Coie Report publicly

---

[4] *See* Perkins Coie LLP, *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University,* May 15, 2019, (hereinafter "Perkins Coie Report").

and indisputably revealed—for the first time—that many OSU employees and officials ("appropriate persons" under operative law) received scores of credible reports that Dr. Strauss was sexually assaulting students throughout his career as an OSU employee and athletic team physician, but that OSU failed to take any action in removing Dr. Strauss from his position, report him to the proper authorities, nor do anything to inform or protect OSU students from Dr. Strauss.

30. Due to OSU's inexcusable failures and cover-up of Dr. Strauss's sexual predatory conduct—which began no later than 1979 and fully revealed only in 2019—OSU's conduct resulted in OSU students and student-athletes being repeatedly, *inter alia*, (i) anally raped; (ii) sodomized; (iii) digitally penetrated for no medical purpose; (iv) had their genitals inspected, rubbed, and massaged for no medical purpose; and, (v) subjected to psychological distress during exams while Dr. Strauss inappropriately touched them for no purpose other than for Dr. Strauss's perverted sexual gratification.

31. As shocking as Dr. Strauss's criminal conduct set upon OSU students and student-athletes is, OSU's complicity by ignoring, enabling, and covering up Dr. Strauss's conduct is equally appalling given that OSU, its administrators, and its staff were supposed to—and in fact were legally obligated to—protect OSU's young and vulnerable student body from these horrors.

32. Indeed, despite receiving numerous credible reports of Dr. Strauss's sexual abuse of OSU students and student-athletes by no later than 1979 (and then no less than hundreds of reports as the years past), OSU continued to employ Dr. Strauss, appointed him as the official team doctor of numerous varsity sports and to the Clinic—thereby permitting him to examine and treat students and student-athletes unchaperoned and behind closed doors—and failed to take any

reasonable steps whatsoever to prevent Dr. Strauss from sexually assaulting OSU students, until at least 1996.[5]

33.     As the Perkins Coie Report and accounts of other victims in this matter make clear, for literally decades OSU was deliberately indifferent to rampant sexual abuse of OSU students by Dr. Strauss.  Specifically, as far back as 1979, during Dr. Strauss's first year of employment at OSU, numerous OSU officials knew Dr. Strauss was sexually assaulting male students and male student-athletes.  If OSU had reasonably acted on this knowledge, the abuse could have been stopped shortly after it started and scores of victims, including JD, could have avoided the horrific sexual abuse they suffered at the hands of Dr. Strauss.  But OSU turned a blind eye and did absolutely nothing, knowing OSU's students were at substantial risk of being sexually abused by a known sexual predator, and indeed one cloaked as a responsible physician and person of authority by OSU itself.

34.     Instead, OSU allowed and enabled a sexual predator to remain employed at OSU for nearly twenty (20) years, and even required some of its student-athletes, like JD, to obtain medical exams and treatment from Dr. Strauss knowing that those student-athletes had a high likelihood of being sexually abused by Dr. Strauss.

35.     Incredibly, for the entire length of Dr. Strauss's tenure at OSU, and even thereafter, OSU was deliberately indifferent to the safety of its students and student-athletes by (i) failing to meaningfully investigate the many complaints of Dr. Strauss's sexual abuse and harassment, (ii) failing to share reports of Dr. Strauss's sexual abuse and harassment, (iii) failing to report such conduct to the Ohio State Medical Board or to law enforcement, and (iv) failing to restrict or remove Dr. Strauss from his positions of authority over OSU students.  If OSU had met these legal

---

[5] Perkins Coie Report, pg. 1.

obligations, the sexual assault, the sexual abuse, and the related suffering of OSU's students and student-athletes (including JD)—at the hands of Dr. Strauss—would have been prevented.

36.     Instead, OSU employed Dr. Strauss to provide medical care and treatment to OSU's students and student-athletes, appointing Dr. Strauss as an assistant professor of medicine, making him the team doctor for numerous varsity sports, and having him take on-call rotations at the Clinic, ensuring that his predation would expand beyond OSU's student-athletes.

37.     Dr. Strauss used this position of trust and confidence to repeatedly and consistently sexually assault OSU students and student-athletes under his care.  He would not have had this opportunity if it were not for this position given to him by OSU.

## JURISDICTION AND VENUE

38.     JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

39.     This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because OSU resides in this District and the events giving rise to JD's claims arose in this District.

## PARTIES

42.     JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

43.     JD is a resident of Ohio and attended college at OSU from 1986 to 1990.

44.     Defendant OSU is a large, public university residing, *inter alia*, in Columbus, Ohio. OSU is, and at all  relevant times has been, a State of Ohio owned and operated public university

and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *et seq.*

45.     At all times relevant hereto, OSU was complicit and deliberately indifferent to the sexual assault and sexually abusive conduct of Dr. Strauss. At all times relevant hereto, OSU was complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually abusive conduct.

46.     At all times relevant hereto, non-party Dr. Strauss was an actual or apparent, duly authorized agent, servant, or employee of OSU and performed medical services for OSU student-patients and members of the OSU community as part of his employment at OSU.

47.     In or about 2005, Dr. Strauss committed suicide.

**SPECIFIC FACTUAL ALLEGATIONS**[6]

**I.      JD and Dr. Strauss**

   **a)      Background**

48.     JD was among the Nation's best football players in high school, being ranked among the top 100 players in the United States during his senior year in high school and being selected to the Ohio all-state football team for the 1985 high school football season.

49.     JD was recruited by dozens of the top college football programs in the United States, including Michigan, Penn. State, UCLA, North Carolina, and—of course—OSU. Born and raised in Ohio, JD selected OSU to pursue his dreams of playing both college and professional football.

---

[6] JD incorporates by reference all allegations set forth above, as if fully set forth herein and below.

  **b)**   <u>**JD's Sexual Abuse by Dr. Strauss**</u>

  50. As set forth above, JD was sexually assaulted by Dr. Strauss on at least four (4) occasions during purported *physical examinations* mandated by OSU and was subjected to sexual harassment by Dr. Strauss on at least one other occasion (during the early-1987 body fat index exam mandated by OSU).

  51. After his first *exam* by Dr. Strauss, in or about July 1986, JD recognized that Dr. Strauss's methods were highly unusual and possibly abusive, but JD was unsure about what he could or should do.  At this point, JD was a Freshman and focused solely on making a positive first-impression on the OSU Football Coaches, securing a roster spot on the OSU Football Team, and doing whatever he could to earn playing time.  In fear that if he said anything to anyone JD could potentially damage his OSU Football future, and potentially risk losing his scholarship, JD said nothing to anyone.

  52. In or about August 1987, as JD's second OSU Football Team-mandated physical examination approached, JD became physically ill at the prospect of having to go for another exam performed by Dr. Strauss, particularly in light of what happened at the body fat index exam earlier that year.

  53. Although JD had engaged in the social consumption of alcohol prior to this point, JD turned heavily to alcohol in order to cope with having to spend additional sessions being groped by Dr. Strauss.  Prior to this impending second *physical exam*, JD binge-consumed alcohol as the exam approached.  When JD appeared at the Ernie Biggs Athletic Complex for the exam, JD had hoped he would be assigned to someone other than Dr. Strauss.  Unfortunately for JD, JD was once again directed by OSU Athletics and Football Staff to report to Dr. Strauss for his OSU-mandated Sophomore Football exam.

54.     Much like the first *exam*, Dr. Strauss ordered JD to get naked from the waist down and then proceeded to manipulate, fondle, and caress JD's penis and testicles for several minutes. When this second *exam* ended, JD knew something was wrong with the way Dr. Strauss had performed the *exam* and decided to tell Billy Hill about his experiences.  Billy Hill, however, dismissed JD's concerns as trivial and essentially told to JD to deal with it and move on.

55.     For other players, the fact that the next exam by Dr. Strauss would be at least a year away may have given them at least some comfort.  But, towards the end of JD's Freshman football season he began to develop chronic injuries and those chronic injuries lasted throughout JD's OSU Football career.  Each time JD was injured after this second *exam* by Dr. Strauss, JD avoided seeking treatment until he was absolutely certain that Dr. Strauss would not be the one to attend to him.  Instead, when he knew Dr. Strauss was the physician on-call in the OSU training facilities, JD waited—and attended practice the next day while suffering through his untreated injury—in the hope that after the next practice he could seek treatment from someone other than Dr. Strauss.

56.     JD's constant fear of having to be treated by Dr. Strauss for football related injuries—and instead of having them properly treated, waiting for the availability of other OSU doctors—had an enormous impact on JD's physical and mental health.  To this day, JD believes that his OSU Football career would have been substantially more productive had he not been in constant fear of being treated by Dr. Strauss, and instead had his chronic injuries treated in due course so he could practice and play in full-health.

57.     In addition, the stress of having to avoid Dr. Strauss and suffer unnecessarily through untreated injuries in order to avoid Dr. Strauss caused JD to turn to alcohol as a coping mechanism.  JD's descension into alcoholism further negatively impacted his ability to play and perform at the highest level of college athletics.  As set forth more fully below, by the time JD left

OSU he was a full-blown alcoholic and remained dependent on alcohol for nearly three (3) decades.

58.     After his second *physical* by Dr. Strauss, JD spent the next three (3) years trying to avoid Dr. Strauss as best he could—enduring needless suffering in the process.  Unfortunately for JD, as noted above, JD was unable to completely avoid Dr. Strauss and was examined by Dr. Strauss on at least two (2) other occasions.  Similar to JD's prior experiences with Dr. Strauss, these additional exams involved Dr. Strauss manipulating, fondling, and caressing JD's penis and testicles for—what JD now knows was—Dr. Strauss's perverse sexual gratification.

### c)     The Devastating Impact of Dr. Strauss's Abuse of JD

59.     JD arrived at OSU having had very limited exposure to drinking alcohol as JD had played multiple sports in high school and never had more than a few drinks at a time and any point in his life.  Due to the multiple instances of sexual abuse by Dr. Strauss and the pervasive fear of trying to avoid Dr. Strauss at all costs, however, JD left OSU deep in the throes of alcoholism.

60.     JD attributes his alcoholism directly to the enormous stress of having to constantly be alert in order to avoid contact with Dr. Strauss and also having to the endure the abuse by Dr. Strauss when contact with him could not be avoided.

61.     JD lived as an alcoholic from his days at OSU, through September 2015, when he finally got sober.  JD's nearly thirty (30) years of alcoholism negatively impacted his first marriage, which ended in divorce, and also severely limited his parental rights over his children for several years after JD's divorce from his first wife.

62.     As a result of the abuse by Dr. Strauss, JD has also avoided—at nearly all costs—visiting doctors, particularly for physicals or other preventive examinations.  Indeed, due to JD's experiences with Dr. Strauss, JD does not trust doctors, often to the detriment of his own health.

63. To this day, when JD does actually go for a physical (at the insistence of his family), the thoughts of what Dr. Strauss did to him runs through his mind. In the run-up to these exams, and during these exams, even thirty (30) years later, JD becomes filled with anxiety and overcome with emotion fearing that he will have to relive the sexual abuse he experienced at the hands of Dr. Strauss.

### d) JD Learns That Others at OSU Were Sexually Abused

64. In or about 2018, when the Perkins Coie investigation was announced, JD learned for the first time that other OSU students and student-athletes had been sexually abused by Dr. Strauss. Although JD was outraged that OSU had clearly known about the pervasive sexual abuse of OSU students and student-athletes by Dr. Strauss for many years—and could have even prevented JD's abuse at the hands of Dr. Strauss—JD was reluctant to get involved for fear that he would have to detail and relive one of the most traumatic experiences of his entire life.

65. In or about late-2018, JD learned that a class action had been filed against OSU, relating to the sexual abuse perpetuated on OSU students and student-athletes by Dr. Strauss, and that JD was a potential member of that class. JD was comforted by this, knowing that stories similar to his would eventually come to light and that redress was being sought against the school that had betrayed JD's trust.

66. Recently, however, JD made the decision that he was ready to tell his story and, thus, decided to file his own separate action as set forth herein.

## II. OSU Knowingly Employed a Serial Sexual Predator

67. In September 1978, Dr. Strauss was hired by OSU as an Assistant Professor in the College of Medicine. Within months after beginning his employment, Dr. Strauss began volunteering in the OSU Athletics Department. By 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program, and in 1981, Dr. Strauss began an appointment in the

Athletics Department. The Athletics Department appointment included responsibilities at the Sports Medicine Clinic located in OSU's Student Health Services, *i.e.*, the Clinic.[7]

68. Beginning in 1978, Dr. Strauss's first year at OSU, and continuing throughout his twenty (20) years at OSU, students and OSU staff reported and referred complaints about Dr. Strauss to numerous OSU employees and administrators. As concluded in the Perkins Coie Report, as early as 1979, OSU employees in OSU's Sports Medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[8]

69. Indeed, for the entire length of Dr. Strauss's employment at OSU, not less than fifty employees in the OSU Athletics Department were aware of student-athlete complaints about Dr. Strauss—at the time they were made—and corroborated them.[9] As concluded in the Governor's Medical Board Report: "Although many were aware of complaints or rumors about the abuse, no one advanced concerns raised by students or unraveled Strauss's 'medical' defenses of his abuse."[10]

70. The Perkins Coie Report specifically concluded that *at least* 177 male students were sexually abused by Dr. Strauss, although the actual number is likely in the thousands, as admitted by OSU.[11] Indeed, the Perkins Coie Report only accounted for former OSU students that were alive, identified and contacted by Perkins Coie, and willing to speak with Perkins Coie about their experiences with Dr. Strauss.

---

[7] Perkins Coie Report, pg. 2.
[8] *Id.*
[9] *Id.* at pg. 88.
[10] Governor's Medical Board Report, pg. 1.
[11] Perkins Coie Report, pg. 1; https://news.osu.edu/university-issues-annual-crime-report (last visited on Sept. 15, 2021).

71.     From 1978 to 1996, Strauss was an OSU team doctor and had regular contact with male student-athletes in many sports including, but not limited to, baseball, football, ice hockey, tennis, swimming, fencing, wrestling, lacrosse, and soccer.  Dr. Strauss also took rotations as the on-call physician at the Clinic, and conducted physicals on other student-athletes, such as JD, that were not necessarily on a team for which Dr. Strauss was responsible.

72.     As further concluded in the Perkins Coie Report, complaints of sexual abuse by Dr. Strauss date back as early as 1979, with approximately half the reports occurring from 1979 to 1988, covering the years in which JD was sexually abused and assaulted as a student-athlete at OSU.[12]

73.     The sexual abuse victims interviewed for the Report outlined Dr. Strauss's years of persistent sexual abuse and detailed the stark similarities in these many stories, described as "both highly credible and cross-corroborative."[13]

74.     Of the 177 Dr. Strauss abuse victims interviewed by Perkins Coie, 153 were associated with Dr. Strauss—at least in part—through his role in the OSU Athletics Department, as was JD.

## II.     OSU Knowingly Employed a Serial Sexual Predator

75.     On May 17, 2019, the Perkins Coie Report was released.  The Report clearly establishes OSU's repeated failures to escalate or report complaints of sexual abuse by Dr. Strauss. The Report also shows OSU repeatedly failed to act despite knowledge reaching OSU's administration, particularly in both the OSU Athletics Department and Sports Medicine Department.[14]

---

[12] *Id.* at pg. 39.
[13] *Id.* at pg. 13.
[14] *Id.* at pg. 2.

76.     Specifically, Dr. Strauss's sexual abuse of OSU students was widely discussed within the administration of OSU's Athletics Department, including his proclivity to conduct inappropriately lengthy and unnecessary genital exams.[15]

77.     As concluded in the Perkins Coie Report, these behaviors would continue for almost two more decades.  The Report also explicitly confirmed that the genital exams engaged in by Dr. Strauss served no medical purpose whatsoever, and only served to satisfy Dr. Strauss sexual predilections and for Dr. Strauss's horrid personal sexual gratification.[16]

78.     As complaints of sexual assaults by Dr. Strauss continued to skyrocket over the years, OSU continued to take no action whatsoever, as confirmed by the Perkins Coie Report: "Despite the persistence, seriousness, and regularity of such complaints, no meaningful action was taken by [OSU] to investigate or address the concerns until January 1996.[17]  Moreover, OSU could have, but did not (i) at the very least, impose conditions on Dr. Strauss's employment, such as a chaperoning policy, (ii) terminate Dr. Strauss for his known sexual assaults of OSU students, and, (iii) pass on the credible reports of Dr. Strauss's regular and persistent abuse of OSU students to the Ohio Medical Board, nor to Federal, State, or local law enforcement.  Indeed, OSU did not even meaningfully investigate Dr. Strauss until eighteen (18) years after he began abusing OSU students and student-athletes, despite the fact that reports of Dr. Strauss's abuse began pouring in almost immediately after his employment at OSU began in 1978.

79.     Among the most troubling facts included in the Perkins Coie Report, and in other complaints filed in the related OSU actions, was the number of OSU employees that had specific

---

[15] *Id.* at pg. 88.
[16] *Id.* at pg. 48.
[17] *Id.* at pg. 3.

knowledge of OSU student complaints against Dr. Strauss, and yet consciously decided to do absolutely nothing.

80.     The following are some examples of reported incidents of sexual abuse by Dr. Strauss on OSU student-athletes identified in the Perkins Coie Report, or otherwise publicly available, and the OSU personnel that knew about them while JD was a student at OSU:

i)      In 1978, Dr. Strauss fondled a wrestling team member, David Mulvin, during a physical exam for a routine wrestling infection—with Dr. Strauss attempting to sexually arouse David during the exam.  David went immediately to the student health center where he complained about Dr. Strauss's fondling to another doctor.  The doctor confirmed for David that the exam he described was "not normal."  The doctor then explained that he would make a note about Dr. Strauss's behavior and pass it along to other appropriate administrators.  David believed that the doctor he reported to was Dr. Strauss's boss at the time and would take action.[18]  This doctor then examined David, without touching him, and gave him an antibiotic.  To the extent the health center doctor or OSU actually did anything to address this report, it was entirely ineffective, because Dr. Strauss kept moving up the ranks at OSU and would go on to sexually assault thousands of more students and student-athletes.

ii)     Also, in 1978, an OSU wrestler visited Dr. Strauss for a groin injury.[19]  The wrestler's injury had caused a blister and bruise on the wrestler's penis, but Dr. Strauss told him it was from masturbating.[20]  Dr. Strauss then told the wrestler that Dr. Strauss

---

[18]  https://sanduskyregister.com/news/91853/perkins-wrestling-champion-among-first-accusers-of-osu-doctor (last visited on Sept. 15, 2021).
[19]  (Proposed Corrected) Second Amended Complaint, *Snyder-Hill, et al. v. The Ohio State University* (S.D.Oh. 2:18-cv-00736-MHW-EPD) (Dkt. No. 103-2) ("Snyder-Hill SAC"), pg. 172-73.
[20]  *Id.* at pg. 173.

needed to *milk* his penis. Dr. Strauss began masturbating the wrestler's penis until the wrestler ejaculated.[21] Shortly after the exam, the wrestler told his Head Coach Chris Ford exactly what happened. Head Coach Ford told the wrestler that he would look into it, but the Coach did not appear to believe him.[22] It does not appear that Head Coach Ford, or anyone else at OSU, did anything to investigate this report.

      iii)     By 1979, OSU personnel in the Athletics Department and Sports Medicine program were aware that Dr. Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[23] It does not appear that OSU administrators did anything regarding these reports.

      iv)     From 1980, through 1984, Melvin Robinson (an OSU track and field athlete) was treated by Dr. Strauss two (2) to three (3) times per year for mandatory physicals and various injuries.[24] During each exam, Dr. Strauss told Melvin to drop his pants and Dr. Strauss would proceed to touch Melvin's genitals.[25] Dr. Strauss's exams made Melvin extremely uncomfortable and Melvin thought they may be inappropriate. After Melvin's first two visits to Dr. Strauss, Melvin told Head Coach Frank Zubovich he did not want to see Dr. Strauss anymore.[26] After each additional exam by Dr. Strauss, Melvin continued to tell Head Coach Zubovich he did not want to be examined by Dr. Strauss anymore, but Head Coach Zubovich completely ignored his multiple requests.[27] In

---

[21] *Id.*
[22] *Id.*
[23] Perkins Coie Report, pg. 2.
[24] Snyder-Hill SAC, pg. 71.
[25] *Id.*
[26] *Id.*
[27] *Id.*

addition, Head Coach Zubovich, nor OSU, did anything to investigate Melvin's complaints.

v)      In 1981, Dr. Strauss himself recognized that "rumors" about his sexual misconduct were circulating at OSU.[28]  It does not appear that OSU did anything to investigate the rumors that Dr. Strauss himself knew about.

vi)      In 1983, a member of the OSU Men's Tennis Team received a physical from Dr. Strauss.[29]  During his physical, Dr. Strauss held the player's penis and said that it was a good size.[30]  Dr. Strauss held the player's foreskin and commented about the player being uncircumcised.  Dr. Strauss then seemingly asked about the player's sexual performance with an uncircumcised penis.  Dr. Strauss continued to hold the player's penis and foreskin for a prolonged period of time, and the player became increasingly uncomfortable.  Dr. Strauss eventually released the player's penis.[31]

vii)      The player's physicals with Dr. Strauss were unlike any physical he had undergone previously or since then.  Each year at OSU, the player tried to avoid getting his annual physical from Dr. Strauss because he felt uncomfortable about the way Dr. Strauss touched his genitals.[32]  But, each year Head Coach John Daly informed the player that he had to get his physicals from Dr. Strauss or he would not be eligible to play tennis at OSU.[33]  Head Coach Daly even went so far as to joke that sending tennis players to Dr. Strauss was a form of punishment.[34]

---

[28] Perkins Coie Report, pg. 95.
[29] Snyder-Hill SAC, pp. 87-88.
[30] *Id.* at pg. 88.
[31] *Id.*
[32] *Id.*
[33] *Id.*, at 89.
[34] *Id.*  At least one other tennis player reported similar conduct by Head Coach Daly (*id.* at 96).

viii)    Also, in 1983, an OSU Head Coach received a report regarding Dr. Strauss when a student sought treatment for a foot injury and was forced to drop his pants.[35]  It does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

ix)    In 1984, this same Head Coach received reports from numerous student-athletes that Dr. Strauss was observing them take showers.[36]  Once again, it does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

x)    Also, in 1984, Kurt Huntsinger (an OSU Swimmer) was directed to Dr. Strauss for his mandatory physical.[37]  Once in the exam room, Dr. Strauss instructed Kurt to drop his trousers.  Dr. Strauss then sat at eye level with Kurt's genitals and began to closely examine Kurt's penis and testicles, moving his penis up and down and side to side.[38]  Kurt was uncomfortable with the examination and even commented to Dr. Strauss about it.  After this first physical, and on several occasions after that, Kurt told Head Coach Dick Sloan that he was uncomfortable with Dr. Strauss's examination.  Head Coach Sloan, however, made light of the complaint, laughed about other athlete's descriptions of their own examinations, and said that is just what Dr. Strauss does.[39]

xi)    In 1986, Dr. Robert Murphy, OSU's Head Team Physician, advised Dr. Strauss that rumors of Dr. Strauss's sexual abuse during physical exams were prevalent throughout the fencing team.  Dr. Strauss and Dr. Murphy agreed that Dr. Strauss would

---

[35] Perkins Coie Report, pg. 96.
[36] *Id.*
[37] Snyder-Hill SAC, pg. 64.
[38] *Id.*
[39] *Id.*

avoid treating fencers.[40]  Unbelievably, neither Dr. Murphy nor OSU did anything to protect non-fencers.  It is entirely illogical to believe that Dr. Strauss's sexual abuse was limited to fencers, even if fencers were the only ones to report the abuse—which of course is not true.  Instead of investigating the reports, OSU and Dr. Murphy did nothing and allowed the potential continued abuse of all OSU male students and non-fencer male student-athletes.

xii)     Also, in 1986, Kelly Reed (an OSU track and field athlete) visited Dr. Strauss after tearing a hamstring.[41]  During the exam, while Kelly's genitals were right "in front" of Dr. Strauss, Dr. Strauss "grabbed [Kelly's] genitals.  And while he did that, he had the gown up.  He was telling me how great my legs are.  He said 'Oh my God.  You have a really nice body.'"[42]  Dr. Strauss then took Kelly's penis in one hand and began rubbing his testicles with the other hand.[43]  Kelly ended the exam early, put on his clothes, and left.[44]  Kelly tried to meet with Athletic Director, Rick Bay, but "was ignored."[45]  Kelly also told OSU Trainer Rob Morris, but Mr. Morris did not seem to take the allegations seriously.[46]

xiii)    Kelly also told Head Coach Frank Zubovich and Assistant Coach Roger Bowen about Dr. Strauss massaging his genitals, but Head Coach Zubovich did not take it seriously and Assistant Coach Bowen simply laughed at Kelly.[47]  Kelly followed up with

---

[40]  Perkins Coie Report, pg. 95.
[41]  https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on Sept. 15, 2021).
[42]  *Id.*
[43]  Snyder-Hill SAC, pg. 54.
[44]  *Id.*
[45]  https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on Sept. 15, 2021).
[46]  Snyder-Hill SAC, pg. 54.
[47]  *Id.*

Head Coach Zubovich to see if the Coach had reported Dr. Strauss, but Head Coach Zubovich ignored him and nothing changed with Dr. Strauss at OSU.[48] It does not appear that Head Coach Zubovich or anyone else at OSU, ever meaningfully investigated the matter.

xiv)  In 1986 or 1987, an OSU swim team member had a physical performed by Dr. Strauss.[49]  While at eye level with the swimmer's genitals, Dr. Strauss began manhandling the swimmer's penis and scrotum, grabbing the swimmer's penis and moving it in all different directions.[50]  When the swimmer tried to tell Head Coach Dick Sloan that the swimmer was uncomfortable with Dr. Strauss, Head Coach Sloan cursed at him and ordered into the swimming pool.[51]  In addition, Head Coach Sloan rebuffed or entirely ignored any negative comments other Swim Team members made about their exams from Dr. Strauss while the swimmer was at OSU from 1986 to 1990.

xv)  In the late-1980s, Roger Beedon (an OSU ice hockey player) went to Dr. Strauss for a physical examination.  During the examination, Dr. Strauss sat on a stool directly in front of Roger, with Dr. Strauss's head at about the height of Roger's penis.[52]  Dr. Strauss required Roger to completely remove his shorts and underwear.  After completing a hernia exam, Dr. Strauss took Roger's penis and lifted it up towards his belly button, inspecting his scrotum.  During this time, he placed his hands on Roger's testicles several times.  In Roger's opinion, Dr. Strauss was trying to stimulate him sexually.[53]

---

[48] *Id.* at pg. 55.
[49] *Id.* at pg. 146.
[50] *Id.* at pg. 146-47.
[51] *Id.* at pg. 147.
[52] (Proposed) Second Amended Class Action Complaint, *Garrett, et al. v. The Ohio State University* (S.D.Oh. 2:18-cv-00692-MHW-EPD) (Dkt. No. 126) ("Garrett SAC"), pg. 22.
[53] Garrett SAC, pp. 22-23.

xvi)    Dr. Strauss also isolated Roger at the OSU ice rink and photographed Roger with his shirt off.  Roger, along with a teammate, reported Dr. Strauss's conduct to then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, who expressed concern, but apparently did nothing.[54]

xvii)    In 1988, Student R and a teammate were questioned by Mr. Davis about Strauss's exams in detail.  Student R remembered Mr. Davis being concerned and thought Strauss would be fired or removed, but nothing ever happened.[55]

xviii)    Also in 1988, an Assistant Coach corroborated that Student R reported to the Assistant Coach about Dr. Strauss and that Mr. Davis was involved in evaluating Student R's report.[56]  The Assistant Coach then met with Mr. Davis, as well as the team's head coach to discuss Student R's report.[57]  Mr. Davis and the head coach "decided then and there" that Dr. Strauss would never see an athlete without a trainer present.[58]  Obviously, this decision was not implemented and at least hundreds, if not thousands, more OSU student-athletes would continue to be sexually abused by Dr. Strauss.

xix)    In 1989, another OSU team physician recalled that he witnessed a student emerge from an exam and announce to the training room that Dr. Strauss had inappropriately examined his genitals.[59]  The team physician recalled speaking to the athletic trainer and that the trainer reported this information to Dr. Murphy (OSU Head Team physician) to be investigated.[60]  Although the team physician recalls being told by

---

[54] Garrett SAC, pg. 23.
[55] Perkins Coie Report, pg. 104.
[56] *Id.* at pg. 105.
[57] *Id.*
[58] *Id.*
[59] *Id.* at pg. 101.
[60] *Id.*

the trainer that the issue had been investigated, there is no evidence that OSU or Dr. Murphy ever investigated or followed up on the incident in any meaningful way.[61]

xx)     In the late 1980s, a nurse reported to Dr. Doris Charles (OSU's Student Health Director) that Dr. Strauss's examinations of male students took much "longer than normal."[62] Dr. Charles dismissed these concerns and did nothing.[63]

xxi)     In the late 1980s to early 1990s, Assistant Athletic Director Larry Romanoff repeatedly reported to Dr. Murphy that Dr. Strauss was showering with student-athletes.[64] It does not appear, however, that Dr. Murphy ever followed up on the reports or showed any concern at all.[65]

81.     The Perkins Coie Report goes through the OSU departments where Dr. Strauss was employed: Student Health, the Athletics Department, the Clinic, etc., and who, in each department, had knowledge of Dr. Strauss's reported sexual abuse.

82.     And, if any one of these dozens of OSU agents, employees, or administrators with knowledge had taken action, investigated further, escalated the reports to OSU executives or reported to law enforcement, Dr. Strauss's reign would have been stopped. But these people, individually and collectively, did absolutely nothing to protect OSU students.

83.     Moreover, the Perkins Coie Report is shocking in its account of just how many OSU personnel admitted that they knew of Dr. Strauss's sexual misconduct when Dr. Strauss was employed at OSU.

---

[61] *Id.*
[62] *Id.* at pg. 121.
[63] *Id.*
[64] *Id.* at pg. 100.
[65] *Id.*

84.     It bears noting that the following numbers do not account for other OSU employees that were no longer alive in 2018-19, or that otherwise simply chose not to be interviewed by Perkins Coie:

i)      At least two (2) OSU Athletic Directors received reports about Dr. Strauss's sexual misconduct.

ii)     At least two (2) OSU Head Team Physicians received reports about Dr. Strauss's sexual misconduct.

iii)    At least six (6) OSU Assistant Athletic Directors received reports about Dr. Strauss's sexual misconduct.

iv)     At least five (5) OSU Team Physicians received reports about Dr. Strauss's sexual misconduct.

v)      At least twenty-two (22) OSU Coaches received reports about Dr. Strauss's sexual misconduct.

vi)     At least one (1) OSU Athletic Training Director received reports about Dr. Strauss's sexual misconduct.

vii)    At least four (4) OSU Athletic Trainers received reports about Dr. Strauss's sexual misconduct.

85.     An unknown number of other OSU personnel, executives, lawyers, trustees, and other OSU agents were aware of complaints against Strauss, or at a minimum, had heard rumors about his disturbing conduct while treating male students and male student-athletes.

86.     Any one of the OSU individuals referenced in the preceding paragraphs herein, each an agent of OSU, was an "appropriate person" under the law. And, each of these referenced individuals was in a position to protect students.

87.     But, for two decades, while thousands of unsuspecting students were subjected to rape, sodomy, and other pervasive sexual molestation, OSU took no action to investigate, to intervene, to share, to escalate, to publicize, to remove, to discipline, to report, or to otherwise protect OSU students and Student Athletes from Dr. Strauss.[66]

## III.    Dr. Strauss is Finally Investigated, But OSU Continues to Cover His Tracks and Enable Dr. Strauss's Sexual Abuse of OSU Students

88.     The Perkins Coie Report set forth that, in January 1995, "Coach A" acknowledged that he personally confronted Dr. Strauss about Dr. Strauss's propensity for showering with student-athletes.  "Coach A" never elevated this concern because he thought he adequately addressed the issues with Dr. Strauss.[67]

89.     Also, in January 1995, two student-patients (Students A and B) from the Clinic each reported complaints of sexually inappropriate conduct by Dr. Strauss to OSU Student Health administrators.[68]

90.     In January 1996, after Student C reported being molested by Strauss to Dr. Ted Grace, Dr. Strauss was finally—after eighteen (18) years of abusing and molesting OSU students and student-athletes under his care—placed on administrative leave from Student Health and the Athletics Department.[69]  In June 1996, OSU's Student Affairs held a disciplinary hearing into these

---

[66] OSU's pattern of ignoring its students' civil rights is nothing new, and likely is continuing at OSU today.  *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University 2 (Sept. 11, 2014), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited on Sept. 15, 2021); *see also see also* Resolution Agreement, Ohio State University, OCR Docket #15-10- 6002, available at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited on Sept. 15, 2021); *and* Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints*, The Columbus Dispatch (June 20, 2018), http://www.dispatch.com/news/20180619/ohio-state-closes- sexual-assault-center-fires-4-after-complaints (last visited on Sept. 15, 2021).
[67] Perkins Coie Report, pg. 91.
[68] *Id*. at pg. 114.
[69] *Id*. at pg. 114-15.

three recent complaints and a 1994 complaint handled by John Lombardo (OSU Head Team Physician)—no other complaints were investigated at this time.[70]

91.    Despite these complaints, and Dr. Strauss's well-known history and scope of sexual abuse at OSU, Dr. Strauss was only terminated from OSU's Athletics Department, "remain[ing] employed at [OSU] as a tenured professor in the School of Public Health."[71]

92.    OSU did remove Dr. Strauss from his position in the OSU Athletics Department, but OSU did not report these findings of abuse to the Ohio Medical Board or to law enforcement, which allowed Dr. Strauss to continue seeing patients.  Indeed, as concluded in the Governor's Medical Board Report: "[N]one of the physicians working with [Dr.] Strauss found occasion to report him to the Medical Board or to law enforcement – even after [OSU] suspended him from seeing patients . . . [nor] did [OSU] or any of its administrators involve campus or outside law enforcement, even after recognizing that the severity and pervasiveness of [Dr.] Strauss' abuse compelled the withdrawal of authority to see patients and the nonrenewal of his contract."[72]

93.    OSU further allowed Dr. Strauss to open an off-campus men's clinic in 1996, advertise in OSU's student newspaper in both 1996 and 1997, and permitted him to offer a student discount, enabling Dr. Strauss's continued abuse of OSU students.[73]

94.    Among its multiple failures, OSU's Student Affairs investigation in 1996 never sought to identify Dr. Strauss's many victims.  Moreover, as set forth in the Perkins Coie Report, OSU failed to take "additional steps to identify other students who had previously complained about [Dr.] Strauss," even as OSU falsely asserted to the Ohio Medical Board that it was working

---

[70] *Id.* at pg. 147.
[71] *Id.* at pg. 145-46.
[72] Governor's Medical Board Report, pg. 3.
[73] Perkins Coie Report, pg. 5.

to do so.[74]  If OSU had made even the slightest efforts to identify and inform victims of Dr. Strauss's abuse and molestation, OSU would have been able to start the healing process for these victims twenty-four (24) years ago.  But, consistent with its history of indifference to its own students' suffering, OSU did nothing.

95.     In October 1997, Dr. Strauss announced that he was retiring from OSU, likely because he now had more limited access to students, and particularly student-athletes.  Quite unbelievably, however, when Dr. Strauss's retirement became effective in March 2018, OSU's "Board of Trustees approved [Dr.] Strauss's appointment as Faculty Emeritus in [OSU's] School of Public Health."[75]

## IV. JD Did Not Know and Could Not Have Reasonably Discovered That Both Dr. Strauss's Sexual Abuse Was Widespread and that OSU Knew About It and Did Nothing

96.     When the investigation into Dr. Strauss was publicly announced, and the Perkins Coie Report was subsequently released, JD—for the first time—realized that he had not only been victimized by Dr. Strauss, but that OSU itself, the institution he had trusted and beloved, had betrayed him.

97.     Indeed, according to the recent testimony of several senior OSU administrative physicians that work with—and had supervisory responsibilities over—Dr. Strauss, OSU student-victims could not have known about OSU's awareness (as early as 1978) and willful disregard of Dr. Strauss's pervasive sexual abuse of OSU students and student athletes, until the release of the Perkins Coie Report.  Specifically, Dr. Ted Grace (former Director of OSU Student Health Services) testified:

---

[74] *Id.* at pg. 4.
[75] *Id.* at pg. 154.

Q: Is there any way any Ohio State student could have known that their university failed on the job for 20 years to get rid of [Dr. Strauss]?

OSU COUNSEL: Object to the form of the question.

A: I don't know of any way.

Dr. Ted Grace Tr., at pg. 307.

98.    Dr. Roger Miller, former Chief of Preventative Medicine of OSU Student Health and former Lead Physician of OSU Student Health, testified:

Q: Reading [the] Perkins Coie [Report] you came to learn that Dr. Strauss started abusing patients in the late 1970s; correct?

A: Yes.

Q: That's not information you knew before; right?

A: That's correct.

. . .

Q: And is there any way OSU -- any OSU student could have known that Dr. Strauss was a sexual predator against students for over 20 -- for approximately 20 years before OSU got rid of him?

A: I don't believe they would have known.

Dr. Roger Miller Tr., at pg. 314.

99.    Up until the release of the Perkins Coie Report, JD believed that the instances of sexual abuse he had experienced at the hands of Dr. Strauss were isolated and that OSU (as an institution) was unaware of Dr. Strauss's conduct. Moreover, it was not until the Perkins Coie Report was released that JD appreciated the magnitude of the abuse of OSU students and student-athletes or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

100.    And, it was not until the release of the Perkins Coie Report that JD realized OSU had knowledge of Dr. Strauss's sexual abuse since shortly after Dr. Strauss was hired—and before JD became an OSU student—but chose to ignore it.  Or, that OSU personnel including, but not limited to, athletic directors, coaches, trainers, administrators, physicians, and executives all knew about reports made by students against Dr. Strauss and did nothing.[76]

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**OSU's Sexually Hostile Culture and Heightened Risk of Sexual Harassment**

101.    JD incorporates by reference the allegations set forth above as if fully set forth herein and below.

102.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance "

103.    Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

104.    Sexual harassment of students is a form of sex discrimination covered by Title IX. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual

---

[76]  JD's lack of knowledge is further supported by the testimony of several physicians that were Dr. Strauss's supervisors at the relevant time.  These physicians each assert that they had no knowledge of the rumors, reports, or complaints against Dr. Strauss until the public release of such information in 2018 or 2019 (Dr. Forrest Smith Tr., pg. 100; Dr. John Lombardo Tr., pp. 56, 169, and 235).

advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

105.    Title IX covers all persons subjected to discrimination in any program or activity of a school that receives any federal financial assistance and covers sexual harassment— including sexual assault and sexual abuse—by school employees, students, and third parties.  Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

106.    Dr. Strauss's pervasive sexual harassment of JD and others, as described herein and in other complaints filed in the related actions, is sex discrimination under Title IX—taking place over nearly two decades.

107.    OSU had actual knowledge of Dr. Strauss's serial sexual harassment and permitted it to continue unchecked until at least 1996.

108.    OSU was specifically notified of Dr. Strauss's sexual harassment and abuse of OSU students by and through OSU employees with authority to take corrective.  As identified above, these specific OSU employees include, but are not limited to:  Head Team Physician and Director of Sports Medicine Dr. Bob Murphy; Assistant Athletic Director Larry Romanoff; Head Tennis Coach John Daly; Head Track and Field Coach Frank Zubovich; Head Swimming Coach Dick Sloan; Head Wrestling Coach Chris Ford; Athletic Director Rick Bay; Athletics Trainer Rob Morris; Assistant Track and Field Coach Roger Brown; Director of Athletics Training Bill Davis; and Student Health Director Dr. Doris Charles.

109.    As identified in additional publicly available materials, other specific OSU employees with authority to take corrective action include, but are not limited to: Director of Student Health Services, Dr. Ted Grace; Athletic Director and Assistant OSU Vice President Andy

Geiger; Athletic Director Jim Jones; Assistant Athletic Director Archie Griffin; Athletic Director Hugh Hindman; Senior Associate Athletic Director Paul Krebs; Head Fencing Coach Charlotte Remenyik; Associate Sports Information Director Steve Snapp; Assistant Athletic Director Richard Delaney; Assistant Director of Student Athlete Support Services John Macko; Head Athletic Trainer Billy Hill; Head Wrestling Coach Russ Hellickson; and Head Gymnastics Coach Peter Kormann.

110.    OSU was required to, but did not, promptly investigate and address the pervasive allegations, reports, and complaints of misconduct by Dr. Strauss.

111.    OSU created and was deliberately indifferent to a sexually hostile culture within its education programs and activities, by, among other things: (i) failing to promptly investigate and respond to complaints about Dr. Strauss's conduct; (ii) promoting Dr. Strauss within OSU thereby enabling his ever increasing access to sexually abuse OSU students; (iii) failing to appropriately supervise Dr. Strauss after reports of his sexual abuse of students began pouring in; (iv) intentionally and deliberately requiring student-athletes to get their annual physicals and other medical care from Dr. Strauss despite these student-athletes discomfort with Dr. Strauss and the coaches' and administrators knowledge of Dr. Strauss's inappropriate sexual conduct towards students; (v) cavalierly dismissing and joking about complaints regarding Dr. Strauss from students and student-athletes; (vi) threatening student-athletes with dismissal from teams if they refused to be treated by Dr. Strauss; (vii) concealing the scope of abuse by Dr. Strauss even after an OSU investigation found Dr. Strauss to be a sexual predator; and, (viii) enabling Dr. Strauss to continue his abuse of OSU students by allowing him to open a nearby men's clinic and advertise it in the OSU student newspaper.

112.     The sexual abuse that JD suffered was so severe that it effectively barred his access to continued educational opportunities, including a safe educational environment and appropriate medical care.  As a direct and proximate result of OSU's creation of and deliberate indifference to a sexually hostile educational environment on OSU's Campus, which violated Title IX, JD suffered, and continues to suffer, damages and injuries.

### COUNT II
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**OSU's Deliberate Indifference to Reported Sexual Harassment**

113.     JD incorporates by reference the allegations set forth above as if fully set forth herein.

114.     Years before Dr. Strauss sexually assaulted JD, OSU had actual knowledge of Dr. Strauss's prior sexual harassment and abuse of male students and student-athletes at OSU. Moreover, between 1978 and 1996, numerous students and student-athletes complained to OSU administrators and staff about Dr. Strauss's inappropriate conduct.

115.     Based upon this reported sexual misconduct by Dr. Strauss, OSU had actual knowledge of the substantial risk, and in fact the likelihood, that Dr. Strauss would sexually harass other OSU students and student-athletes, like JD.

116.     OSU agents, employees, administrators, and officials, armed with this knowledge, had the authority to address the risk posed by Dr. Strauss, and had the authority to take corrective measures—but until no earlier than 1996, failed to act.  OSU's failure to address the substantial risk to OSU students posed by Dr. Strauss, was manifestly unreasonable in light of the known circumstances surrounding Dr. Strauss.  As such, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other OSU students and student-athletes, like JD.

117.    As a result of OSU's deliberate indifference, JD was subjected to the severest of sexual abuse by Dr. Strauss, depriving him of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

118.    As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of OSU students and student-athletes, which violated Title IX, JD has suffered and continues to suffer damages and injuries.

**PRAYER FOR RELIEF**

Wherefore, JD respectfully requests that this Court:

A.    Enter judgment against OSU, and in favor of JD, in such amounts that will completely and adequately compensate JD for all the damages he has suffered including, but not limited to, payment of JD's medical and other expenses incurred as a consequence of the sexual assault of JD and OSU's deliberate indifference thereto; damages for JD's pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto; damages for deprivation of equal access to the educational opportunities and benefits provided by OSU; damages for past, present and future emotional pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto; and, loss of past and future earnings and earning capacity attributable to Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto, in an amount to be determined at trial;

B.    Award JD punitive damages against OSU in an amount to be determined by a jury for OSU's violations of federal law;

C.    Award JD pre-judgment and post-judgment interest;

D.    Award JD his actual expenses of litigation, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b); and

    E.      Award JD such other and further relief as the Court deems just and proper.

Dated: Columbus, Ohio
       September 22, 2021

                  Respectfully Submitted,


                  /s/ John C. Camillus
                  John C. Camillus, Trial Attorney (0077435)
                  Law Offices of John C. Camillus, LLC
                  P.O. Box 141410
                  Columbus, Ohio 43214
                  (614) 992-1000
                  (614) 559-6731 (facsimile)
                  jcamillus@camilluslaw.com

                  Mitchell Schuster, Esq. (*pro hac vice* forthcoming)
                  Benjamin D. Bianco, Esq. (*pro hac vice* forthcoming)
                  Meister Seelig & Fein LLP
                  125 Park Avenue, 7th Floor
                  New York, New York 10017
                  (212) 655-3500
                  (212) 655-3535 (facsimile)
                  ms@msf-law.com
                  bdb@msf-law.com

                  ***COUNSEL FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on September 22, 2021.


By: <u>*/s/ John C. Camillus*</u>
Attorney for Plaintiff